Filed 10/6/21  Tarantino's v. Herringbone Tavern CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TARANTINO'S, INC., et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>HERRINGBONE TAVERN, INC., et al.,<br><br>    Defendants and Appellants. | A162257<br><br>(City & County of San Francisco Super. Ct. No. CGC-19-581505) |

Herringbone Tavern, Inc. (Herringbone), Chris Henry (Henry), and their codefendants appeal from an order denying their petition to compel arbitration of claims made against them in a suit brought by Gary Burns and Timothy McDonnell, the former owners of Tarantino's Restaurant (Tarantino's or the Restaurant).  The suit arises out of a dispute over the purchase of Tarantino's by Herringbone and Henry and their alleged default in paying for it.  The trial court found a waiver of the right to arbitrate and on that basis denied relief.  We affirm.

## I. BACKGROUND

### A.

On December 13, 2019, Tarantino's, Inc., Burns, and McDonnell (collectively, the Burns-McDonnell Parties) filed a complaint in superior court against Henry, Herringbone (named as "Herringbone Tavern, Inc., a

California corporation and dba Tarantino's"), Barrel House Tavern, and Apple Annie's, LLC dba Tommy's Joynt (collectively, the Herringbone Parties), alleging as follows.

For nearly 40 years, Burns and McDonnell owned and operated Tarantino's in San Francisco's Fisherman's Wharf area. They decided to sell the Restaurant because they were both advancing in age and Burns had fallen seriously ill. After Henry learned that Burns and McDonnell wished to sell Tarantino's, he expressed interest in buying the Restaurant. Henry, an experienced restaurateur who owned and operated or was acquiring various other eating establishments, including the Barrel House Tavern, Tommy's Joynt, and Fisherman's Grotto, eventually convinced Burns and McDonnell to sell the Restaurant to him.

Henry drafted and presented a purchase agreement under which he would buy Tarantino's for $2 million from McDonnell. Under this initial purchase agreement, Henry was to pay a $600,000 deposit at the November 30, 2017 closing, and the remainder of the purchase price over 192 installments. Henry also drafted and presented a $1.4 million promissory note in favor of Tarantino's, Inc., the entity through which Burns and McDonnell owned and operated the Restaurant. Henry signed the promissory note on Herringbone's behalf and personally guaranteed the payment obligations under it.

Paragraph 18 of the initial purchase agreement, headed "Disputes," stated in part, "If a dispute arises concerning this agreement or the sale, Seller and Buyer will try in good faith to settle it through mediation conducted by a mediator to be mutually selected. [¶] . . . [¶] If the dispute is not resolved within 30 days after it is referred to the mediator, Seller and

2

Buyer agree that the dispute will be arbitrated by an arbitrator to be mutually selected."

After missing the November 30, 2017 closing date, Henry and his escrow agent drafted a second purchase agreement (this time between Herringbone and Tarantino's, Inc.) with a new closing date but containing the same Paragraph 18 related to "Disputes." Henry signed this agreement for Herringbone on December 19, 2017, but put off the closing date until March 19, 2018, and failed to produce the promised $600,000 down payment, claiming to only have $450,000. To cover the shortage, Henry persuaded Burns and McDonnell to take a second promissory note in the amount of $150,000. Henry signed this second promissory note on Herringbone's behalf and personally guaranteed it. Despite the restructured payment terms, Henry and Herringbone again failed to make agreed payments.

On the foregoing alleged facts, the Burns-McDonnell Parties pleaded claims against the Herringbone Parties for breach of contract, elder abuse, unjust enrichment, fraud, unfair business practices, and breach of the implied covenant of good faith and fair dealing. They sought damages and an injunction to stop the Herringbone Parties from spending, dispersing, transferring or otherwise withdrawing money from accounts at numerous financial institutions.

### B.

On December 16, 2019, the Burns-McDonnell Parties filed an ex parte application for a right to attach order and an order for the issuance of a writ of attachment against the Herringbone Parties. On January 2, 2020, the trial court granted the request and issued a right to attach order along with an order for issuance of a writ of attachment against Henry and Herringbone and in favor of Tarantino's Inc. in the amount of $1,731,768. The

3

Herringbone Parties filed a notice of appeal from the January 2, 2020 order, but later abandoned the appeal, leading this court to dismiss it.

On January 15, 2020, the Herringbone Parties filed a demurrer. In the demurrer, they argued the action was premature because the parties had not followed the dispute resolution process set forth in either form of the purchase agreement, which called for mediation and then submission of any claims that could not be settled to arbitration. They did not, however, seek to compel arbitration or to stay the proceedings until the agreed private dispute resolution process was completed. The trial court never heard the demurrer as the parties agreed to hold it in abeyance pending settlement discussions.

Concurrently with the filing of the demurrer, Herringbone filed a cross-complaint against Tarantino's, Inc., and a newly added party, Jeff Scharosch.[1] In the cross-complaint, Herringbone sought to rescind the purchase agreement and promissory notes and additionally sought an award of damages based on its claim that it had been induced to enter into those agreements by the Burns-McDonnell Parties' misrepresentations and concealment concerning the income of Tarantino's and the condition of the building in which it was housed.

The Herringbone Parties also served discovery, including three sets of requests for admission, three sets of requests for production of documents, and three sets of form interrogatories. The Burns-McDonnell Parties continued with their own discovery by issuing a deposition subpoena for the Herringbone Parties' financial records to Poppy Bank. In October 2020, the Herringbone Parties filed a motion to quash the Poppy Bank subpoena. At the hearing on that motion, the pro tem judge delayed ruling on the motion

---

[1] Scharosch is not a party to either of the purchase agreements and therefore never agreed to arbitrate.

4

because the Herringbone Parties represented that they intended to file a petition to compel arbitration.

On November 30, 2020, the Burns-McDonnell Parties filed a first amended complaint that added a cause of action for fraudulent transfer under California's Uniform Voidable Transactions Act, Civil Code section 3439 et seq. and Doe defendants Dipsea, LP dba Dipsea Cafe, Bon Air Management, LLC, general partner of Dipsea, LP, Sabrina Henry, and the CBH1 2014 Trust.  The Burns-McDonnell Parties named these newly added defendants because of their alleged participation with the Herringbone Parties in a scheme to carry out the fraudulent and voidable transfer of assets and thus frustrate the Burns-McDonnell Parties' ability to recover on the claims asserted in the complaint.

## C.

On December 14, 2020, the Herringbone Parties filed their petition to compel arbitration and request for a stay of this proceeding.  The Burns-McDonnell Parties opposed the petition, arguing, among other things, that even if there was an agreement to arbitrate, the Herringbone Parties had waived their right to arbitration under it.  In their reply to the opposition, the Herringbone Parties argued, in essence, that they did not waive their right to compel arbitration because their delay was justified by a purported "standstill" agreement, and that they had preserved their right to compel arbitration by seeking dismissal, in part, because of the existence of an arbitration agreement.

Agreeing with the Burns-McDonnell Parties, the trial court issued an order on January 20, 2021, denying relief on the ground that the Herringbone Parties had waived the right to arbitrate.  It framed its analysis under *St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 (*St. Agnes Medical Center*), the leading California case on waiver of

5

arbitral rights. In its analysis, the court weighed and considered the various factors outlined in *St. Agnes Medical Center* for the evaluation of whether a waiver of arbitral rights has occurred.

First, the trial court found that the Herringbone Parties had filed a cross-complaint in January 2020 without asking for a stay of the proceedings. Second, the trial court found that the Herringbone Parties had substantially invoked the "litigation machinery" in court over the prior year. It pointed to the facts that the Herringbone Parties had appealed from the court's attachment order, filed a demurrer, propounded discovery, and moved to quash deposition subpoenas the Burns-McDonnell Parties served on third parties. It acknowledged that, in their demurrer, the Herringbone Parties specifically referred to and quoted the mediation and arbitration provisions of the purchase agreements, but noted that they did not move to compel arbitration or seek a stay at that time. In the trial court's view, the Herringbone Parties' filing of a petition to compel arbitration many months later was a " 'belated strategy' " in response to the steps taken by the Burns-McDonnell parties in court, if not a " 'strategy of last resort.' "

Third, the trial court found that the Herringbone Parties had unreasonably delayed for a long period before seeking a stay, although they were well aware of the arbitration agreement. It rejected the Herringbone Parties' contention that the parties had entered into a standstill agreement in late February 2020, to allow them time to discuss settlement. Instead, the trial court found that the Burns-McDonnell Parties' showing established that the parties' negotiations quickly dissolved, and the parties continued with litigation. It also pointed out that, in their case management statement filed on June 25, 2020, the Herringbone Parties made no reference to a standstill agreement or to any intention to move to compel arbitration, but stated that

6

the demurrer (the hearing date for which had been vacated due to the COVID-19 pandemic) should be calendared for hearing, and took the position that the parties' contemplated discovery would be completed by sometime in the latter half of 2020. Even assuming a standstill agreement was in place for several weeks in early 2020, the court concluded that the Herringbone Parties' lack of diligence in seeking to compel arbitration was unreasonable.

This timely appeal followed.[2]

## II. DISCUSSION

We agree with the trial court's analysis of the waiver issue presented here, substantially for the reasons given in the court's January 20, 2021 order. It is true that, as explained in *St. Agnes Medical Center*, *supra*, 31 Cal.4th at pp. 1195–1196, under both federal and state law, there is a policy favoring arbitration; that under this policy "any doubts regarding a waiver allegation should be resolved in favor of arbitration"; and that, as a result, "waivers are not to be lightly inferred . . . ." But we think the Burns-McDonnell Parties have met the "heavy burden" *St. Agnes Medical Center* placed upon them to show a waiver.

The Herringbone Parties filed a cross-complaint and failed to seek a stay of the proceedings. They argue that, by raising the issue of arbitration as a ground for dismissal via demurrer, they reserved their right to arbitrate. Granted, had the Herringbone Parties succeeded in obtaining dismissal because of the existence of an arbitration clause, the inevitable next step would have been for the Burns-McDonnell Parties to assert their claims in arbitration. But raising the issue of arbitration indirectly via demurrer is not

---

[2] We granted a motion from the Burns-McDonnell Parties seeking calendar preference in this appeal on the ground that Burns is 71 years of age and has cancer. (Code Civ. Proc., § 36, subd. (a); see *Fox v. Superior Court* (2018) 21 Cal.App.5th 529, 533–536.)

7

the same as doing so affirmatively by a petition to compel arbitration, accompanied by a request for a stay.  Nearly a year passed after the Herringbone Parties filed their demurrer before they sought to compel arbitration and stay proceedings.  The trial court found, and we agree, that their delay was unreasonable.  To justify their inaction, the Herringbone Parties point to the pandemic.  We do not see the pandemic as a general excuse.  The emergency conditions that created court closures and other severe problems moving civil cases forward in the spring of 2020 were temporary.  We take judicial notice that, by June 1, 2020, the superior court was open for business and calendaring motions in the normal course.  (Super. Ct. S.F., Public Notice:  Court to Restore Services Starting June 1 (May 27, 2020) <https://www.sfsuperiorcourt.org/sites/default/files/images/last% 20version%20public%20notice.pdf?1633032247435> [as of (Oct. 6, 2021)]; Evid. Code, §§ 452, subds. (c), (e), (g), 459, subd. (a).)

To be sure, the evidence is somewhat mixed as to whether, prior to December 2020, the Herringbone Parties wished to force the dispute into arbitration.  The record suggests some ambivalence on their part about whether the action should remain in a judicial forum.  As the Burns-McDonnell Parties point out, the Herringbone Parties sought discovery; filed an appeal in this court; added a party to the litigation who had not agreed to arbitrate; filed a case management statement addressing a schedule for completion of discovery; and filed a motion to quash a subpoena.  And they did all this without mentioning or otherwise signaling any intention to invoke the arbitration clause.  On the other hand, the Herringbone Parties not only raised the issue of arbitration in their demurrer and apparently arranged for a standstill pending settlement negotiations, but after they changed counsel in the summer of 2020, their new counsel stated in correspondence and other

8

communications with opposing counsel that they were still interested in pursuing settlement negotiations and still wished to reserve their right to seek arbitration while negotiations were pending, which is consistent with an understanding that the purported standstill the parties had agreed to in February 2020 remained in effect.

But the trial court found as a factual matter that any standstill entered by the parties in February 2020 to facilitate settlement negotiations had expired by the summer of 2020. The court noted that the Herringbone Parties did "not properly authenticate the evidence on which they rel[ied]" as proof of an open-ended "standstill," and even accepting such an agreement was made, the Herringbone Parties still failed to "make [any] showing as to how long that agreement remained in place." Resolving this factual disputed issue against the Herringbone Parties, the court accepted the Burns-McDonnell Parties' proof that the parties' February 2020 settlement negotiations " 'quickly dissolved' " and that " 'the Parties continued with litigation' " almost immediately.

On this record, we are satisfied that the " ' " 'litigation machinery' " ' " in court was " ' " 'substantially invoked' " ' " and that the parties were " ' " 'well into preparation of a lawsuit' " ' " (*St. Agnes Medical Center*, *supra*, 31 Cal.4th at p. 1196), before the Herringbone Parties finally gave notice in December 2020 of an intention to seek arbitral resolution. When their petition to compel was finally filed, it came two weeks after the Burns-McDonnell Parties filed an amended complaint on November 30, 2020, expanding the scope of the litigation by adding claims and parties that may not have been subject to arbitration. Thus, the Burns-McDonnell Parties— facing no impediment to doing so—sought to take steps in court that could not have been taken in arbitration. That constitutes an " ' " 'important

9

intervening step[]' " ' " (*ibid.*) militating in favor of a finding of waiver. By then, it was too late for the Herringbone Parties to try to block further expansion of the litigation by forcing the proceedings into arbitration.

Procedurally, the parties disagree on what standard of appellate review applies here, with the Herringbone Parties contending our review is de novo because the material facts are undisputed, and the Burns-McDonnell Parties contending that we should review for substantial evidence unless the only inference that can be drawn from the record favors nonwaiver. As noted above, the trial court appears to have interpreted the Herringbone Parties' failure to invoke their right to arbitration immediately as tactical in nature. We decline to second-guess that judgment. Because more than one inference about the Herringbone Parties' intentions may be drawn from the facts in the record, we share the Burns-McDonnell Parties' view of the applicable standard of review. We therefore need go no further than to conclude the trial court's waiver determination is supported by substantial evidence. (*St. Agnes Medical Center, supra*, 31 Cal.4th at p. 1196.)

### III. DISPOSITION

Affirmed. Costs to the respondents.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
BROWN, J.

10